# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued December 18, 2024        Decided August 8, 2025

No. 24-1048

ESTATE OF JOSEPH A. INSINGA, DECEASED, BY AMANDA
GILMORE, PERSONAL REPRESENTATIVE,
APPELLANT

v.

COMMISSIONER OF INTERNAL REVENUE,
APPELLEE

---

On Appeal from the United States Tax Court

---

*Usman Mohammad* argued the cause for appellant. With him on the briefs was *Caroline Rule*.

*Julie Ciamporcero Avetta*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Bruce R. Ellisen*, Attorney.

Before: MILLETT, KATSAS and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Circuit Judge* KATSAS.

2

MILLETT, *Circuit Judge*: In early 2007, Joseph Insinga submitted whistleblower materials to the Internal Revenue Service regarding a tax-avoidance scheme undertaken by two corporations. When Mr. Insinga sought an award for his contribution, the Whistleblower Office applied the incorrect legal standard in denying it. The Office also supplied the Tax Court with a deficient administrative record when Mr. Insinga appealed. Rather than remand for the Whistleblower Office to apply the correct legal standard to a complete record, the Tax Court affirmed by itself applying the correct standard in the first instance to an incomplete record. We reverse.[1]

**I**

**A**

Prior to 2006, awards to whistleblowers for reporting the underpayment of taxes were made at the sole discretion of the Internal Revenue Service based on reports from Informants' Claims Examiner units, with no opportunity for judicial review. *See Lissack v. Commissioner*, 125 F.4th 245, 249 (D.C. Cir. 2025); TREASURY INSPECTOR GEN. FOR TAX ADMIN., REFERENCE NO. 2006-30-092, THE INFORMANTS' REWARDS PROGRAM NEEDS MORE CENTRALIZED OVERSIGHT 2 (2006) ("IG REPORT"). The IRS concluded that the "lack of centralized and active management oversight of the [Whistleblower] Program increase[d] the risk of errors such as improper payment of rewards or incorrect rejection of valid claims." IG REPORT 2.

---

[1] Mr. Insinga died during the Tax Court litigation and his estate was substituted. *See Insinga v. Commissioner*, 157 T.C. 94, 95 (2021). For brevity, we continue referring to the appellant as Mr. Insinga.

Congress acted on the IRS's recommendations to "centralize management of the reward program and to reduce the processing time for claims." STAFF OF JOINT COMM. ON TAXATION, 109TH CONG., TECHNICAL EXPLANATION OF H.R. 6408, THE "TAX RELIEF AND HEALTH CARE ACT OF 2006,"AS INTRODUCED IN THE HOUSE ON DECEMBER 7, 2006 89 (Comm. Print 2006). As relevant here, Congress made several changes to the whistleblower reward system. *See* Tax Relief and Health Care Act of 2006 ("2006 Act"), Pub. L. No. 109-432, § 406, 120 Stat. 2922, 2958-2960 (2006).

First, Congress created the Whistleblower Office within the IRS and charged it with analyzing information from whistleblowers and making award determinations. 2006 Act § 406(b), 120 Stat. at 2959-2960; *see* 26 C.F.R. § 301.7623-1 *et seq.* By regulation, the Whistleblower Office must decide whether to issue an award based on the "administrative claim file[.]" 26 C.F.R. § 301.7623-3(e)(2). The administrative claim file must include the whistleblower's application for an award and any other information provided by the whistleblower, *id.* § 301.7623-3(e)(2)(i), notes from interviews with the whistleblower, *id.* § 301.7623-3(e)(2)(ii), any contracts with the whistleblower, *id.* § 301.7623-3(e)(2)(iv), and any correspondence between the Whistleblower Office and the whistleblower, *id.* § 301.7623-3(e)(2)(vi), (viii). The only documents from the IRS that, at a minimum, must be included are (1) the "Confidential Evaluation Report on Claim for Award" (Form 11369), which is a form that is filled out by IRS investigators from outside the Whistleblower Office who used the information provided by the whistleblower, *id.* § 301.7623-3(e)(2)(iii), (2) all "documents made by officers and employees of the Whistleblower Office and considered by the official making the award determination," *id.* § 301.7623-3(e)(2)(vii), and (3) any additional information actually considered by the Whistleblower Office, *id.* § 301.7623-3(e)(2)(ix).

Second, Congress gave whistleblowers the right to appeal "[a]ny determination regarding an award" to the Tax Court. 26 U.S.C. § 7623(b)(4). Because federal courts of appeals have jurisdiction over the Tax Court, either party may appeal the Tax Court's decision. *Id.* § 7482(a)(1).

Third, Congress made whistleblower awards mandatory under certain circumstances. Whenever the IRS "proceeds with any administrative or judicial action" for the underpayment of taxes "based on information brought to the Secretary's attention" by a whistleblower, the whistleblower "shall" receive "at least 15 percent but not more than 30 percent of the proceeds collected as a result of the action[.]" 26 U.S.C. § 7623(b)(1). The "determination of the amount of such award by the Whistleblower Office shall depend upon the extent to which the individual substantially contributed to such action." *Id.*

In December 2012, the IRS issued a notice of proposed rulemaking ("NPRM") that interpreted Section 7623(b)(1)'s "proceeds based on" language to narrowly restrict awards to "only" three circumstances: "when the IRS [1] initiates a new action that it would not have initiated, [2] expands the scope of an ongoing action that it would not have expanded, or [3] continues to pursue an ongoing action that it would not have continued but for the information provided." Awards for Information Relating to Detecting Underpayments of Tax or Violations of the Internal Revenue Laws, 77 Fed. Reg. 74,798, 74,800 (Dec. 18, 2012). Whistleblowers who provide information that did not cause the IRS to take one of these three actions would be ineligible for an award.

The IRS abandoned that stringent three-part test in its final rule, promulgated in August 2014. The IRS explained that "by

listing exclusive actions taken by the IRS" in the NPRM, the IRS had indicated "that individuals who provide information that is not only used by the IRS, but is in fact critical to sustaining tax adjustments, might not receive awards" simply because their information did not result in one of the three enumerated actions. Awards for Information Relating to Detecting Underpayments of Tax or Violations of the Internal Revenue Laws, 79 Fed. Reg. 47,246, 47,251 (Aug. 12, 2014) ("Final Rule"). To correct this problem, the final rule "adopt[ed] a general standard for when the IRS proceeds based on information provided" that asks whether the information "substantially contributes to the action[.]" *Id.* The three enumerated actions were retained, but only as "examples" of when information provided by the whistleblower "may substantially contribute" to the IRS's action. *Id.* Whether the whistleblower made a substantial contribution "depend[s] on the facts and circumstances of each individual case." *Id*; *see* 26 C.F.R. § 301.7623-2(b).

In 2023, this court held that the IRS's "substantial contribution" standard was a reasonable interpretation of Section 7623 under the *Chevron* doctrine. *Lissack v. Commissioner*, 68 F.4th 1312, 1322 (D.C. Cir. 2023), *vacated*, 144 S. Ct. 2707 (2024). After the Supreme Court overturned the *Chevron* doctrine, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), our judgment was vacated, *see Lissack v. Commissioner*, 144 S. Ct. 2707 (2024). On remand, this court reinstated its judgment, holding that the IRS's "substantial contribution" interpretation of Section 7623 is the correct interpretation of the statute. *Lissack*, 125 F.4th at 257.

6

**B**

**1**

At the beginning of 2007, the IRS was investigating whether two companies, referred to as X, Inc. and V, Inc., had used special-purpose vehicles provided by a foreign bank to avoid taxes. Separate IRS investigative teams were assigned to each company. Both teams were exploring potential bases for liability. One theory was that the exchanges between the companies and the foreign bank lacked economic substance because the transfers were just (non-deductible) loans disguised as "factoring transactions" in order to generate tax deductions.[2] Neither team had yet determined what legal theory the IRS would rely upon to recoup taxes from their respective targets. The V, Inc. investigative team acknowledged that it was still assessing whether the foreign bank had engaged in a "factoring" transaction "or simply a loan to" V, Inc. App. 131. And the X, Inc. team was still "determining how [the foreign bank] treated the transaction." App. 1899.

---

[2] The difference between loaning and factoring depends on whether risk is transferred between the parties. Generally, if the party paying money has a guaranteed right to repayment, the transaction is a loan. If the paying party does not have a guaranteed right to repayment and has assumed the risk associated with the other party's accounts receivable, it is a factoring transaction. *See Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 234 (2d Cir. 1999); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1068-1069 (2d Cir. 1995); *Alessio Azzari, Inc. v. Commissioner*, 136 T.C. 178, 180 n.3 (2011).

Mr. Insinga worked at the foreign bank that provided the special-purpose vehicles to V, Inc. and X, Inc. On April 5, 2007, Mr. Insinga supplied the IRS with a 2002 credit application indicating that the foreign bank had simply loaned V, Inc. money and had not engaged in a factoring transaction. Mr. Insinga then met with an IRS representative on June 25, 2007, and provided a 2005 credit application for X, Inc. showing the same for that company. Mr. Insinga's information was shared with the V, Inc. and X, Inc. investigative teams. Representatives from both teams interviewed Mr. Insinga on August 20, 2007. After Mr. Insinga provided all of his information, the IRS issued a summons to the foreign bank.

The credit applications and the documents produced by the summons indicated that the foreign bank had not engaged in factoring transactions with the companies, but in fact had made loans. By mischaracterizing the exchanges as factoring transactions, the companies had been able to claim tax deductions that they could not have claimed for the loans. In 2008, the IRS's Office of Chief Counsel produced an advice memorandum for the X, Inc. investigative team concluding that the "no economic substance" theory of liability was viable because there was no economic reality to the claim that the loans were factoring transactions. Also in 2008, both the X, Inc. and V, Inc. investigative teams issued Notices of Proposed Adjustments ("NOPAs") to the corporations stating that the transactions lacked economic substance because they were loans, not factoring transactions. The advice memorandum and the two X, Inc. NOPAs cited the credit applications provided by Mr. Insinga to support their conclusion that the transactions lacked economic substance. The X, Inc. and V, Inc. NOPAs also cited information generated by the summons issued to the foreign bank. The final revenue agent's report for the V, Inc. tax adjustment also relied on those documents. Both corporations pursued administrative appeals.

While the appeals were ongoing, the Whistleblower Office assessed whether Mr. Insinga was entitled to a whistleblower award. In December 2011, the Whistleblower Office manager assigned to Mr. Insinga's case completed an initial internal memorandum in which he recommended denying awards because Mr. Insinga had not contributed "new information" to either investigative team. App. 86.

The Whistleblower Office's director, Steven Whitlock, rejected this recommendation. As to V, Inc., Director Whitlock noted that the memorandum did not acknowledge or discuss that Mr. Insinga's information had been "helpful[,]" even though the Form 11369 provided by the V, Inc. investigative team suggested that Mr. Insinga's information had in fact been "helpful[.]" App. 3729 (Director Whitlock's email); App. 131 (V, Inc. Form 11369).

In particular, the Form 11369 stated that Mr. Insinga's credit application provided "interesting information on the transaction from the perspective of [the foreign bank]" and "strongly indicate[d] that [the foreign bank] viewed this transaction as a loan to [V, Inc.] as opposed to an equity investment in a foreign factoring subsidiary." App. 131. The Form also states that the credit application "led to issuing an information document request to the company and subsequently, a summons" to the foreign bank, which resulted in additional "helpful information." App. 131. That summons "would likely not have been issued without the information provided by" Mr. Insinga. App. 131. The summons, in turn, "resulted in receiving other information, some of which was cited in the [Revenue Agent Report]." App. 131. The Form states that although "the issue was already under examination" when the IRS received Mr. Insinga's information, "the

information received from [Mr. Insinga] and the subsequent summons, was helpful." App. 131.

In light of these statements, Director Whitlock directed that the "helpful[ness]" of Mr. Insinga's information "need[ed] to be quantified." App. 3729. More specifically, Director Whitlock stated that "[t]he question here is whether" Mr. Insinga's information "substantially contributed to the collection of proceeds." App. 3729.

The Whistleblower Office reassessed Mr. Insinga's awards during 2012. By the end of 2012, IRS appeals had recommended settlement agreements with V, Inc., and X, Inc., based on the "no economic substance" theory. V, Inc. settled with the IRS in 2012 and X, Inc. settled in 2013.

In September 2012, in response to Director Whitlock's request, Whistleblower Office analysts completed a second internal memorandum on Mr. Insinga's award requests. This time, the memorandum acknowledged that Mr. Insinga's information was "helpful to the [IRS] in understanding" the transaction. App. 3821. Nevertheless, the memorandum concluded that Mr. Insinga's information "did not cause the Service to initiate the audit, expand the scope of the audit, or continue to pursue an issue that it otherwise would not have pursued." App. 3821. From that, the memorandum concluded that the IRS had not proceeded "based on [his] information," and so recommended rejecting Mr. Insinga's claim for an award. App. 3821.

Director Whitlock responded that "all of [his] questions [were] answered" save for one query about the importance of Mr. Insinga's evidence for the V, Inc. investigation. App. 3817.

Three months later, in December 2012, the IRS issued the notice of proposed rulemaking interpreting Section 7623(b)(1) to limit awards strictly to situations where the whistleblower's information causes the IRS to "initiate[] a new action that it would not have initiated, expand[] the scope of an ongoing action that it would not have expanded, or continue[] to pursue an ongoing action that it would not have continued but for the information provided." NPRM, 77 Fed. Reg. at 74,800.

Following the NPRM, Director Whitlock agreed without explanation that the awards should be denied. Mr. Insinga received a denial letter on April 15, 2013. The stated reason for his denial was that "[t]he information [Mr. Insinga] provided did not result in the collection of any proceeds[.]" App. 3825. He timely appealed to the Tax Court.

**2**

At the time Mr. Insinga appealed to the Tax Court, discovery was available for whistleblower claims. *Cf. Kasper v. Commissioner*, 150 T.C. 8, 20 (2018) (deciding for the first time that review in whistleblower cases should be limited to the administrative record, and generally not supplemented by discovery). Through discovery, Mr. Insinga obtained IRS documents that the Whistleblower Office had not included in the administrative record. The Whistleblower Office also answered questions in response to Mr. Insinga's interrogatory requests.

Mr. Insinga subsequently moved for partial summary judgment against the IRS for denying his X, Inc. and V, Inc. whistleblower awards. The IRS cross-moved for summary judgment. The Tax Court granted summary judgment for the IRS. In so doing, the Tax Court rejected three arguments that Mr. Insinga now advances on appeal.

First, the Tax Court disagreed with Mr. Insinga that the Whistleblower Office made omissions in designating the administrative record. The Tax Court emphasized that, as relevant here, the administrative record included the Form 11369, a slide deck presented by the X, Inc. team to the V, Inc. team prior to receiving Mr. Insinga's information, some correspondence between the Whistleblower Office and members of the investigative teams that occurred during the 2012 reassessment of Mr. Insinga's claim, and the decisions in the X, Inc. and V, Inc. appeals. Mr. Insinga argued that the record also should have included the economic substance NOPAs issued to the corporations, the V, Inc. revenue agent's report, the Chief Counsel's recommendation memorandum to the X, Inc. team, internal emails and memoranda produced by the investigative teams, and government admissions made during the Tax Court discovery process. The Tax Court ruled that these documents were permissibly omitted from the record because the Whistleblower Office had not "considered" them and there were no "unusual circumstances" warranting their inclusion. App. 92.

Second, the Tax Court rejected Mr. Insinga's argument that the Whistleblower Office applied the legal standard from the NPRM rather than the standard adopted in the final rule. According to the Tax Court, "nothing in the record indicates that the [Whistleblower Office] relied on the proposed regulations[.]" App. 94 n.9.

Finally, the Tax Court concluded that Mr. Insinga did not substantially contribute to the X, Inc. and V, Inc. investigations. Relying on the record designated by the Whistleblower Office, the Tax Court held that "the IRS did not proceed based on petitioner's information because petitioner's information did not substantially contribute to any IRS action."

App. 95. The Tax Court concluded that the X, Inc. team's presentation in 2007, just prior to the submission of Mr. Insinga's information, showed that that team was already on track to recoup money from X, Inc. Lastly, the Tax Court determined that Mr. Insinga's evidence did not support the "no economic substance" theory that led to the settlement with V, Inc.

## II

We review Tax Court summary judgment decisions *de novo*. *Byers v. Commissioner*, 740 F.3d 668, 675 (D.C. Cir. 2014). We review the Tax Court's refusal to supplement the record for an abuse of discretion. *See American Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008). A "material error of law" necessarily constitutes an abuse of discretion. *Musgrave v. Warner*, 104 F.4th 355, 365 (D.C. Cir. 2024) (quoting *In re White*, 64 F.4th 302, 312 (D.C. Cir. 2023)).

The Tax Court has jurisdiction over "any determination regarding an award." 26 U.S.C. § 7623(b)(4). So long as the IRS proceeds with an administrative or judicial action against the taxpayer who was the subject of the whistleblower's information, an award letter to the whistleblower from the Whistleblower Office constitutes an award "determination" for purposes of Section 7623(b)(4). *See Lissack*, 125 F.4th at 254 (Congress "made generous provision for judicial review of Whistleblower Office award decisions.").

The Tax Court had jurisdiction over Mr. Insinga's case because Mr. Insinga received a denial letter that counts as a "determination regarding an award." 26 U.S.C. § 7623(b)(4). That is because the IRS proceeded against X, Inc. and V, Inc. with its investigations, and Mr. Insinga's information was

forwarded to both investigative teams. Accordingly, we have jurisdiction under 26 U.S.C. § 7482(a)(1).

## III

The Tax Court made two legal errors. First, rather than reversing the Whistleblower Office's award determinations for failing to apply the correct legal standard and remanding, the Tax Court affirmed by applying the correct legal standard itself in the first instance, in violation of the ordinary remand rule. Second, the Tax Court declined to supplement the administrative record even though the Whistleblower Office arbitrarily omitted relevant materials that favored Mr. Insinga. These errors require remand to the Whistleblower Office to make a new decision on Mr. Insinga's award applications that apply the correct legal standard to a legally sufficient record.

## A

In deciding in the first instance whether awards were due under a different legal standard than that applied by the Whistleblower Office, the Tax Court committed a straightforward *Chenery* violation. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). *Chenery* lays out a "'simple but fundamental rule of administrative law' that reviewing courts 'must judge the propriety of [agency] action solely by the grounds invoked by the agency.'" *Calcutt v. Federal Deposit Ins. Corp.*, 598 U.S. 623, 624 (2023) (per curiam) (quoting *Chenery*, 332 U.S. at 196). Under the "ordinary 'remand' rule[,]" *INS v. Orlando Ventura*, 537 U.S. 12, 18 (2002), "the function of the reviewing court ends when an error of law is laid bare[,]" and "[a]t that point the matter once more goes to the [agency] for reconsideration[,]" *Federal Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952).

The Whistleblower's Office is the expert entity designated by Congress to apply the relevant law—here, the substantial-contribution test—and then to decide whether Mr. Insinga was entitled to an award. There is no dispute in this case that the IRS proceeded against and settled with the two taxpayer corporations. As the IRS recognized in its Final Rule, by statute the IRS is required to give awards based on how much the individual "substantially contributed to such action" against a taxpayer. 26 U.S.C. § 7623(b)(1); *see* 26 C.F.R. § 301.7623-2(b)(1); Final Rule, 79 Fed. Reg. at 47,251, 47,266.

This court's precedent agrees. In *Lissack*, this court held that the statute requires payments for information that "advances to some substantial degree the IRS's recovery" of taxes. 125 F.4th at 258. That is because Section 7623 provides that the size of a mandatory award within the 15-30% range "shall depend upon the extent to which the individual substantially contributed to such action." *Id.* (quoting 26 U.S.C. § 7623(b)(1)). "In pegging the award amount to the degree of substantiality of the whistleblower's assistance, the statute plainly means that all such awards depend on the whistleblower having contributed in some substantial degree to the [IRS's] ability to proceed." *Id.* While *Lissack* made that decision in the context of interpreting the phrase "administrative action," this court easily reaches the same result interpreting the plain text of Section 7623(b)(1) directly.

On the face of its decision, though, the Whistleblower Office never assessed whether Mr. Insinga "advanced to some substantial degree" the investigation of V, Inc. or X, Inc. It determined only that his information did not cause the Service to initiate the audit, expand its scope, or continue to pursue the investigation. App. 3821. That is, the Office applied almost word for word the rejected test from the NPRM rather than the substantial-contribution test from the statute and Final Rule.

Discussion of the substantial-contribution standard, or variants of that phrase, make no appearance in the Whistleblower Office's formal analyses or decisions. The Whistleblower Office's denial letter to Mr. Insinga only states conclusorily that Mr. Insinga's information "did not result in the collection of any proceeds from any of the taxpayers[.]" App. 103.

Yet whether the IRS proceeded based on Mr. Insinga's information is the question that the substantial contribution test seeks to answer. That is, to determine whether the IRS proceeded based on Mr. Insinga's information, the Whistleblower Office had to assess whether Mr. Insinga's information "advance[d] to some substantial degree the IRS's recovery" of taxes. *Lissack*, 125 F.4th at 258; 26 C.F.R. § 301.7623-2(b)(1) ("[T]he IRS *proceeds based on* information provided by a whistleblower when the information provided substantially contributes to an action against a person identified by the whistleblower.").

The Whistleblower Office's second—and final—internal memorandum to Director Whitlock recommending denial of Mr. Insinga's claims also failed to apply the substantial-contribution test. The second memorandum admitted that Mr. Insinga's information had brought the IRS "additional knowledge" of V, Inc.'s transaction. App. 3821. It also acknowledged that the Appeals Case Memorandum relies on documents that "may have been secured based on" Mr. Insinga's information. App. 3821. Nevertheless, the memorandum denied an award in language that anticipated exactly the soon-to-be-published NPRM test—Mr. Insinga's information "did not cause the Service to [1] initiate the audit, [2] expand the scope of the audit, or [3] continue to pursue an issue that it otherwise would not have pursued." App. 3821.

"Thus," although Mr. Insinga's information was "helpful to the [IRS] in understanding" the transaction, Mr. Insinga's award should be denied because the IRS did not proceed "based on that information." App. 3821.

On its face, then, the memorandum applied and relied on the exact test contained in the 2012 NPRM that the IRS later repudiated. Nowhere in the second memorandum does the Whistleblower Office answer the question of whether Mr. Insinga's admitted helpfulness with the investigations did or did not contribute substantially to the proceedings, nor does it even speak in that register.

The dissenting opinion (at 9-10) reasons that Director Whitlock disagreed with the second memorandum and himself applied the substantial contribution test. Not so. In 2011, when the Whistleblower Office issued its first internal memorandum, Director Whitlock ordered a reassessment because the memorandum failed to assess whether Mr. Insinga's "helpful" information "substantially contributed" to the proceeding. App. 3729.

Then in 2012, on the eve of the NPRM's promulgation, Director Whitlock suddenly abandoned any reference to a substantial contribution inquiry and simply affirmed the memorandum's conclusion couched in "initiate," "expand," and "continue" language, App. 3821, stating that "all of [his] questions [were] answered," save for whether Mr. Insinga's information was more relevant to the "business purpose" theory or the "economic substance" theory, App. 3817.

The dissenting opinion (at 9) suggests that, in asking the Whistleblower Office that follow-up question, the Director was undertaking a "much more nuanced assessment" that equates with the substantial contribution standard. But nothing in the

content of the relevant communications suggests that the Director did anything other than acquiesce in the memorandum's application of the forthcoming cramped test for determining that a proceeding was based on whistleblower information. In 2013, when the Whistleblower Office sent Mr. Insinga his denial letter, neither the IRS nor any court had yet held that Section 7623(b)(1)'s language applies when the whistleblower substantially contributes to the proceeding. So the Office just followed the approach of the then-issued NPRM. *Cf. Theodore Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011) (noting "[o]ur general presumption that a federal agency will follow its own regulations").

In addition, the dissenting opinion's suggestion that an unspoken substantial-contribution analysis was simply voiced in terms of the NPRM's test cannot be reconciled with the IRS's own about-face in its published Final Rule. In 2014, while Mr. Insinga's appeal to the Tax Court was pending, the IRS rejected the NPRM's interpretation of the statute and adopted the textually required substantial-contribution test, admitting that the NPRM test failed to capture the statutorily required inquiry. Final Rule, 79 Fed. Reg. at 47,266 (codified at 26 C.F.R. § 301.7623-2(b)(1)) ("[T]he IRS *proceeds based on* information provided by a whistleblower when the information provided substantially contributes to an action against a person identified by the whistleblower."); *id.* at 47,251 (noting that, under the NPRM's test, "individuals who provide information that is not only used by the IRS, but is in fact critical to sustaining tax adjustments, might not receive awards[]"). In other words, while the Final Rule noted that the "initiate," expand," or "continue" factors could be relevant to the substantial-contribution inquiry, the IRS was explicit that applying such a tightly cabined test missed the statutory substantial-contribution mark. *Id.* at 47,251. As a result, the

dissenting opinion's assertion that the Office applied the correct legal standard lacks grounding in the record of this case.

With the legal framework for analyzing Mr. Insinga's whistleblower award claims having materially changed, the proper course for the Tax Court was to reverse and remand for the Whistleblower Office to apply the new legal standard in the first instance. IRS decisions are subject to the *Chenery* rule, *see Montrois v. United States*, 916 F.3d 1056, 1064 (D.C. Cir. 2019), and that rule applies equally to whistleblower award determinations, *see* 26 U.S.C. § 7623(b)(4); *Kasper*, 150 T.C. at 23. Remand was therefore the course the Tax Court should have taken. *See Ventura*, 537 U.S. at 17; *Calcutt*, 598 U.S. at 624-625.

The Tax Court instead held that "nothing in the record indicates that the [Whistleblower Office] relied on the proposed regulation[] in reaching its determination[.]" App. 94 n.9. That is incorrect. The Whistleblower Office's recommendation memorandum parroted the NPRM's strict three-part legal test for awards. *Compare* App. 3821 (stating that Mr. Insinga's information "did not cause the Service to initiate the audit, expand the scope of the audit, or continue to pursue an issue that it otherwise would not have pursued"), *with* NPRM, 77 Fed. Reg. at 74,800 (allowing awards only when information causes the IRS to "initiate[] a new action that it would not have initiated, expand[] the scope of an ongoing action that it would not have expanded, or continue[] to pursue an ongoing action that it would not have continued but for the information provided[]").

In addition, the Tax Court cited no evidence that the Whistleblower Office applied the appropriate "substantial contribution" test in its final decision denying the awards. Rather, the Tax Court itself applied the substantial contribution

test in the first instance and concluded that "petitioner's information did not substantially contribute to any IRS action." App. 95.

In applying the corrected legal standard to the record in Mr. Insinga's case, the Tax Court wrongly assumed for itself the job of the Whistleblower Office. That was legal error that requires reversal. *Kasper*, 150 T.C. at 23 ("Under the *Chenery* doctrine we can uphold the [Whistleblower Office's] determination only on the grounds it actually relied on when making its determination."); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("[J]udicial judgment cannot be made to do service for an administrative judgment."); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course, except in rare circumstances, is to remand to the agency[.]"); *Ventura*, 537 U.S. at 16 (A court "should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.").

There is an exception if there "is not the slightest uncertainty as to the outcome" on remand. *Calcutt*, 598 U.S. at 629 (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)); *see also FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 930 (2025) (Remand is unnecessary when it "would be pointless.").

This case does not fit that bill. Mr. Insinga argues that even if his information did not initiate, expand, or continue the investigations, his information nonetheless substantially contributed to the proceeding by significantly improving the evidentiary basis for the IRS's cases against X, Inc. and V, Inc. so that the proposed assessments could go forward and survive any efforts by the companies to deny liability. Evidence in the record, as well as evidence erroneously excluded from the administrative record, *see* pp. 22-25 *infra*, indicates that the

credit applications Mr. Insinga provided led to the foreign bank summons in at least the V, Inc. case and perhaps the X, Inc. case as well.

In fact, the V, Inc. investigators explained straightforwardly that the summons to the foreign bank "would likely not have been issued without the information provided by" Mr. Insinga—"interesting" information that "strongly indicate[d] that [the foreign bank] viewed this transaction as a loan to [V, Inc.] as opposed to an equity investment in a foreign factoring subsidiary." App. 131. And the investigators confirmed that the summons provided them "helpful information" about the transaction it was examining. App. 131.

The record also shows that the information generated by the summons, in conjunction with the credit applications Mr. Insinga provided, was a relevant factor in the IRS's success in recouping money from both corporations. App. 2276 n.41, 2937 n.41, 2291, 2951-2953. At a bare minimum, the evidence creates significant uncertainty as to how the Whistleblower Office would assess Mr. Insinga's contribution now freed from the NPRM's unduly restrictive test. That reinforces the appropriateness of remand.

**B**

The Tax Court also incorrectly rejected Mr. Insinga's request to supplement the administrative record.

The Tax Court appropriately limits its review of whistleblower award determinations to the administrative record. *See Kasper*, 150 T.C. at 17*; Whistleblower 972-17W v. Commissioner*, 159 T.C. 1, 3 (2022); *Van Bemmelen v. Commissioner*, 155 T.C. 64, 72-78 (2020). When reviewing agency action, courts should "review the whole record or those

parts of it cited by a party[.]" 5 U.S.C. § 706; *see Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). Nothing in the whistleblower award statute suggests a different rule of review. 26 U.S.C. § 7623(b)(4). And absent a contrary indication, the APA's default scope of review governs. *See* 5 U.S.C. § 559 (Exceptions must be made "expressly.").

However, just because review is confined to the record does not mean that an agency may "deliberately or negligently exclude[]" from its record "documents that may have been adverse to its decision[.]" *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *American Wildlands*, 530 F.3d at 1002). Although an agency need not "'comb all [] files for potentially relevant data,'" just because an agency "cannot be expected to find *all* documents" does not mean the agency is excused from finding "*any*" documents that contradict its conclusion. *Kent County, Delaware Levy Court v. EPA*, 963 F.2d 391, 395-396 (D.C. Cir. 1992) (quoting *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299, 1306 (D.C. Cir. 1991)); *see American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 243-244 (D.C. Cir. 2008) (Tatel, J., concurring). Such an exclusion lacks reason.

Yet here, evidence is missing from the administrative record as compiled by the Whistleblower Office that (i) is material to Mr. Insinga's award determinations, (ii) was part of the Office's history of decision-making or key stages of the IRS proceedings, and (iii) contradicts the Whistleblower Office's conclusion. That evidence needed to be considered on review by the Tax Court, and that court's decision not to supplement the record with such relevant evidence was an abuse of discretion.

First, the two unredacted "no economic substance" NOPAs issued against X, Inc. were excluded. These documents laid out the IRS's case that X, Inc. tried to disguise its bank loan as a factoring transaction to claim tax deductions. Both NOPAs cited the 2005 credit application that Mr. Insinga provided, as well as information produced by the summons that the IRS issued shortly after it received Mr. Insinga's information. The crux of Mr. Insinga's argument is that the credit applications were key to the IRS's decision to issue NOPAs based on the "no economic substance" theory. And that theory of liability, in turn, ended up succeeding on appeal where others had failed, and it led to the recoupment of unpaid taxes from X, Inc. Because the NOPAs' impact bears directly on the substantiality of Mr. Insinga's information, the NOPAs should have been included in the record.

Second, the Chief Counsel's unredacted advice memorandum for the X, Inc. investigation was omitted from the record. The X, Inc. team presumably requested this memorandum to determine whether its case would be strong enough to succeed if legally challenged. The memorandum cited the credit application provided by Mr. Insinga multiple times, and then concluded by encouraging the X, Inc. team to proceed with its investigation. The Tax Court acknowledged that the Whistleblower Office relied upon the Chief Counsel's memorandum in determining whether to grant Mr. Insinga an award. By regulation, the administrative record must include all "information considered by the official making the award determination." 26 C.F.R. § 301.7623-3(e)(2)(ix). Given the Office's admitted consideration of the memorandum, the significance of its content, and the Whistleblower Office's

reliance upon it, the memorandum needed to be part of the agency record.[3]

Third, the record lacks the revenue agent's report on V, Inc. that cited the credit application supplied by Mr. Insinga. This document represented the IRS's official position regarding V, Inc.'s proposed tax adjustment. That it relied upon the credit application provided by Mr. Insinga and information generated by the ensuing foreign bank summons speaks to the question of whether Mr. Insinga's information substantially contributed to the final adjustment. The Tax Court's omission of this document was an abuse of discretion because Whistleblower Office regulations state specifically that revenue agent reports are relevant to award determinations. *See* 26 C.F.R. § 301.7623-3(e)(2)(iii) (noting that "Form 11369" will note relevant "revenue agent reports"). In addition, the Whistleblower Office's decision was influenced by the V, Inc. revenue agent report because the Form 11369 attachment for Mr. Insinga's case discusses it. App. 132. Citing the report, the attachment states that Mr. Insinga's information was "helpful" and that information in the revenue agent's report was produced by the summons to the foreign bank that "would likely not have been issued without the information provided by" Mr. Insinga. App. 131. As evidence favorable to Mr. Insinga, known by the Whistleblower Office,

---

[3] The dissenting opinion agrees (at 11-12) that IRS regulations required the advice memorandum to be included in the administrative record. Nonetheless, the dissenting opinion argues (at 12) that this error was harmless because the Whistleblower Office reviewed the advice memorandum. That cannot be right because the Whistleblower Office applied the wrong legal standard when it reviewed the advice memorandum. And, in any event, the advice memorandum must be included in the administrative record to facilitate judicial review after the Whistleblower Office applies the correct standard.

and recognized by regulation as relevant, the revenue agent's report should have been included in the record.

Fourth, internal emails and audit plans for the X, Inc. and V, Inc. investigations were omitted from the record. This excluded evidence is particularly relevant in assessing Mr. Insinga's contribution to the X, Inc. investigation. For example, while the Tax Court concluded that the X, Inc. team had the investigation well in hand by the time Mr. Insinga submitted his information, an internal X, Inc. team email sent prior to Mr. Insinga's submission frankly admitted that "we would not prevail in arguing that the factoring is a tax sham" based on the evidence that the team then possessed. App. 1862. Although the X, Inc. team never admitted to the Whistleblower Office that Mr. Insinga's information caused it to issue the summons to the foreign bank, its internal audit plan reveals that, prior to Mr. Insinga's submission, there was no intention to issue that summons. App. 1864-1868. And although the Whistleblower Office concluded that Mr. Insinga provided no "new information" to the X, Inc. investigative team, App. 86, internal emails from the team stated otherwise, explaining that "the informant on the [foreign bank] transaction" provided what "appears to be some additional information * * * that we did not previously have." App. 2074.

None of this is to say that the Whistleblower Office was required to find every relevant email generated by the IRS during the investigations. *See Kent County*, 963 F.2d at 395. But it was required to identify evidence relevant to the award determinations—especially when regulations recognize the importance of the information at issue here. *See* 26 C.F.R. § 301.7623-3(e)(2)(iii), (ix). Here, it is hard to understand why the Whistleblower Office included correspondence with members of the investigative teams from 2012 arguing that Mr. Insinga's contribution was minimal, years after the

investigations concluded, but not correspondence from the same team members saying the opposite while the 2006 and 2007 investigations were underway.

The record also shows that collecting information from the investigative period was possible because information from that same time period that cut against Mr. Insinga's claim made it into the record. Including evidence in the record that was unfavorable to Mr. Insinga while omitting evidence from relevant documents created during that same time that are favorable to Mr. Insinga lacks any reasoned justification in this case. As the relevant evidence was available to the Whistleblower Office at the time of its final decision, it should be included in the record on remand.

The dissenting opinion states (at 12-13) that a March 2007 presentation shows that the investigations were so advanced before Mr. Insinga came forward that there was no need for the Whistleblower Office to look for further evidence. But neither the Whistleblower Office nor the Tax Court explained how the 2007 presentation proves that the X, Inc. and V, Inc. investigative teams were already planning, before Mr. Insinga's submission, to issue the summons to the foreign bank that generated so much evidence relied upon in the later proceedings. Certainly, none of the slides or anything else in the record show that the IRS intended to issue the summons, and the sequence of events suggests otherwise. So does the contemporary statement from a V, Inc. investigator that the summons likely would not have issued but for Mr. Insinga's information. Given that, Mr. Insinga has made a strong showing that the internal audit plan from 2006 should have been included in the record to show that the IRS did not plan to issue the summons before Mr. Insinga came forward.

The dissenting opinion also stresses (at 13) that the omitted documents are extraneous because some of them do not speak to the "far more relevant" question of what the IRS knew before Mr. Insinga came forward. Because the 2007 presentation shows that the IRS knew and had liability "theories" about both X, Inc. and V, Inc. prior to Mr. Insinga blowing the whistle, the dissenting opinion concludes that no other documents could show that he made a substantial contribution. Dissenting Op. 1, 5, 10.

But there is a big difference between knowing something and being able to prove it in court (or to obtain a favorable settlement). Mr. Insinga does not contest that the IRS knew about both companies' questionable tax behavior before he came forward. Instead, he argues that his whistleblowing led to evidence that ensured the IRS would succeed if the companies challenged an assessment administratively or in court.

Although the 2007 presentation shows that the IRS could estimate how much money was at stake before Mr. Insinga came forward, the list of thirteen discussion questions at the presentation's end suggests that the investigations were far from a lock. Such questions included: "Will [the] National Office support a debt vs equity position * * * ?" App. 1495. "Should the Hybrid Instruments be considered one instrument (or two) for purposes of debt vs equity issue?" App. 1495. "For Tax Purposes, does title transfer on the A/R and, if so, when?" App. 1495. "What are our strongest positions?" App. 1497. "What are our weakest positions?" App. 1497. And, most critically for evaluating substantial contribution, "What positions will not be supported by [the] National Office?" App. 1496.

Because the documents omitted by the Whistleblower Office disclose IRS doubts about its ability to succeed prior to obtaining Mr. Insinga's information, they were improperly excluded from a decisional record that centered on the Office's claims of investigative self-sufficiency.

The IRS emphasizes that the Whistleblower Office followed the IRS regulation governing the administrative record for whistleblower cases. Recall that the regulation requires little more in the administrative record than the whistleblower's application for an award, the Form 11369, documents created by Whistleblower Office personnel, and any other information relied upon by the Whistleblower Office. 26 C.F.R. § 301.7623-3(e). The government stresses that Mr. Insinga has forfeited any challenge to this regulation by failing to contest its legality before the Tax Court. Gov't Br. 48-51.

Although we agree that Mr. Insinga forfeited a challenge to the lawfulness of the regulation, that is neither here nor there. The regulation creates only a floor, not a ceiling, on the relevant components of a whistleblower record. *See* 26 C.F.R. § 301.7623-3(e)(2) (listing materials the file "will include"). So adherence to the regulatory minimum does not license the Whistleblower Office to decide an award based on a truncated record that omits only helpful information for the whistleblower, including especially information identified by regulation as pertinent to the Office's decision. Whistleblower Office record designations are not limited by the regulation, and the Office must comply with the Administrative Procedure Act's requirement that decisions be made based on the "whole record[.]" 5 U.S.C. § 706; *see Shafer & Freeman Lakes Env't. Conservation Corp. v. FERC*, 992 F.3d 1071, 1087 (D.C. Cir. 2021) ("[W]e necessarily must have before us the 'whole record' for the agency actions we are asked to review."). Mr. Insinga has consistently argued that excluding relevant

evidence violated this requirement. And he is correct. The Office's decisions about the content of the administrative record cannot thwart Congress's mandate that awards "shall" be made to those who substantially contribute to an IRS proceeding, 26 U.S.C. § 7623(b)(1), or judicial review to ensure agency compliance with that law.

Finally, Mr. Insinga contends that the Tax Court erred in not including in the administrative record the government's responses obtained in discovery. That argument fails. "It is black-letter administrative law that, in an Administrative Procedure Act case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *New LifeCare Hospitals of North Carolina, LLC v. Becerra*, 7 F.4th 1215, 1224 (D.C. Cir. 2021) (citation omitted). The discovery responses were produced in the Tax Court proceeding—long after the Whistleblower Office denied Mr. Insinga's award—and they are not necessary to assess reasonably the merits of Mr. Insinga's claim. *See Kent County*, 963 F.2d at 396 (declining to supplement administrative record with evidence postdating agency's decision).

In sum, Congress created the Whistleblower Office because it wanted a centralized decisionmaker dedicated to gathering all relevant evidence needed to accurately determine whistleblower awards. Tax investigations are complicated, and it is hard to assess how much any piece of evidence contributed to a particular tax adjustment. The difficulty of the Whistleblower Office's task explains why it must create an accurate administrative record that allows a fair and reasonable assessment of a whistleblower's contribution, or non-contribution, to a tax proceeding. The Whistleblower Office cannot fulfill its mandate by looking only at the records most readily at hand or favorable to a denial while omitting other

available and material information, including documents identified by regulation as important to the decision.

## C

We decline to assess in the first instance whether the denial of Mr. Insinga's awards was arbitrary and capricious. To do otherwise would be to commit the same mistake as the Tax Court. We note only that nothing in this opinion controls the Whistleblower Office's decision on remand once it has properly compiled the record and applied the correct legal standard.

## IV

For the foregoing reasons, the judgment of the Tax Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

KATSAS, *Circuit Judge*, dissenting: The Whistleblower Office of the Internal Revenue Service concluded that Joseph Insinga was not entitled to an award for information he provided to the IRS about the suspect transactions of two corporate taxpayers. Insinga's claimed entitlement turns on whether he substantially contributed to successful IRS actions against the taxpayers. Ample evidence indicates he did not— before Insinga provided any information, the IRS had already designated the transactions as a top priority, investigated them for many months, and developed the theory that ultimately supported tax adjustments. My colleagues do not dispute that this evidence is substantial. Instead, they contend that the Whistleblower Office applied an incorrect legal standard and should have considered more evidence. I respectfully disagree.

I

A

The Internal Revenue Code requires the IRS to pay an award to a whistleblower if the agency recovers proceeds from a taxpayer "based on" information provided by the whistleblower. 26 U.S.C. § 7623(b)(1). In that circumstance, the whistleblower is entitled to an award of between 15 and 30 percent of the proceeds. *Id.* Congress provided for this mandatory award in 2006. Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, § 406, 120 Stat. 2922, 2958–60.

In 2008, the IRS issued interim guidance construing section 7623(b). The guidance offered a nonexclusive list of considerations to determine whether a mandatory award was warranted, including whether information provided by the whistleblower helped the IRS to identify a new issue, caused the IRS to initiate an examination, or changed the way the IRS collected or analyzed information. *See* IRS Bulletin Notice 2008–4, 2007 WL 4427860, § 3.07 (Jan. 14, 2008).

In December 2012, the IRS proposed a regulation that would have construed section 7623(b) more restrictively. Under the proposed regulation, a whistleblower would be entitled to an award only if his information caused the IRS to initiate a new action, expand the scope of an ongoing action, or pursue an ongoing action that it otherwise would have abandoned. Awards for Information Relating to Detecting Underpayments of Tax or Violations of the Internal Revenue Laws, 77 Fed. Reg. 74798, 74800 (Dec. 18, 2012). After notice and comment, the IRS concluded that this interpretation would have improperly foreclosed awards in some cases where the information provided is useful or even "critical" to the IRS. Awards for Information Relating to Detecting Underpayments of Tax or Violations of the Internal Revenue Laws, 79 Fed. Reg. 47246, 47252 (Aug. 12, 2014).

Instead, the final regulation adopted an approach more like the 2008 guidance. The regulation keys awards to whether the whistleblower's information substantially contributes to an action, and it lists the criteria from the 2012 regulation as examples of substantial contribution. The regulation provides:

> [T]he IRS *proceeds based on* information provided by a whistleblower when the information provided substantially contributes to an action against a person identified by the whistleblower. For example, the IRS proceeds based on the information provided when the IRS initiates a new action, expands the scope of an ongoing action, or continues to pursue an ongoing action, that the IRS would not have initiated, expanded the scope of, or continued to pursue, but for the information provided.

26 C.F.R. § 301.7623-2(b)(1).

3

B

In the early 2000s, a foreign bank engineered a scheme to help U.S. companies evade tax liability. In transactions with each client company, the bank would create a foreign entity supposedly to purchase the company's accounts receivable. In reality, these purported purchases were mere loans, structured to allow the client to move income offshore.

Two of the bank's clients—denominated as X and V— were large companies subject to ongoing IRS audits.[1] The examination teams assigned to X and V were investigating the companies' transactions with the bank by early 2006, and they obtained many transaction-related documents through regular audits. In October 2006, the IRS designated the transactions as among their top priorities. The X and V teams began to coordinate their investigations and made substantial headway over the next six months. At a national IRS meeting in March 2007, the X team gave a presentation drawing on some 81 documents to detail the transaction. The team concluded: "The facts clearly support the position that the Receivable backed [*sic*] transaction lacks economic substance and is structured to generate tax benefits with little or no cost" to X. A.1489. The X team then requested advice from the IRS Chief Counsel on what legal theories it might use to adjust that taxpayer's liability. The V team, which attended the presentation, was also preparing a "significant proposed adjustment." *Id.* at 911.

Insinga, a former employee of the bank, filed a whistleblower submission with the IRS in April 2007. Most notably, the submission included credit applications suggesting that the bank viewed the X and V transactions as loans rather than purchases of receivables. The X application did not prove

---

[1] We redact the names of the companies pursuant to 26 U.S.C. § 6103, D.C. Circuit Rule 47.1(a), and Tax Court Rule 345.

4

especially useful. A few months after Insinga's submission, the X team independently obtained the application through a "routine" summons that would have issued "with or without the whistleblower filing." A.3296; *see id.* at 3828. The V application was slightly more helpful. Although the V team had already planned to issue an adjustment, the application spurred it to issue a summons to the bank, which turned up documents that corroborated the team's understanding.

In June 2008, the IRS Chief Counsel issued an advice memorandum in response to the X team's request. The memorandum concluded that the purported sale of receivables "lacked economic substance" and so could be disregarded for tax purposes. A.3610. It marshaled evidence about cash flows and other accounting realities, most of which was detailed in the X team's March 2007 presentation. For additional support, it cited the X credit application that the IRS had obtained first from Insinga and then through a routine summons.

The X and V teams issued notices of proposed adjustment (NOPAs). The notices also tracked the reasoning in the 2007 presentation. They concluded that the purported sale of receivables lacked economic substance, based on an analysis of economic realities and documents obtained through routine audits. For additional support, they cited the credit applications and other material traceable to Insinga's submission.

When X and V challenged the proposed adjustments, the IRS Office of Appeals ultimately settled both cases. In internal analyses, the Office accepted the economic-substance rationale and discounted its expected recovery to account for litigation risks. It abandoned an alternative theory resting on the characterization of certain securities in the relevant transactions as equity rather than debt.

5

C

After the adjustments, the Whistleblower Office (WBO) considered whether Insinga was entitled to an award. The X and V teams gave input on IRS Form 11369, which audit teams use to help the WBO evaluate award claims. The X team explained that Insinga filed his submission after the team had been investigating the transaction "for many months," classified it as a top priority, and "substantially" understood it. A.3736. The V team similarly explained that Insinga made his submission after the team had examined the transaction, classified it as a top priority, and started to prepare "a significant proposed adjustment." *Id.* at 3485.

In December 2011, a WBO program manager considered these reports and recommended denying Insinga an award. As to the X adjustment, he reasoned that Insinga merely "confirmed" facts already known to the audit team, provided "no new information" to the team, and "could not provide any specifics in regard to the transactions." A.3732. As to the V adjustment, he reasoned that the audit team had "substantially developed" its theory before receiving Insinga's information and that the "additional" information provided was "not of any significance and was not utilized" in the audit team's final write-up. *Id.* The WBO Director agreed with the X recommendation but demanded more information as to V. Specifically, he noted that the V team had issued a summons based on Insinga's report, and he wanted to know whether material acquired through the summons "substantially contributed to the collection of proceeds." *Id.* at 3729.

In September 2012, the program manager again recommended denying Insinga an award. He reiterated that Insinga's submission brought "no new information" to the attention of the X audit team. A.3821. The manager

acknowledged that Insinga's submission caused the V team to issue a summons that yielded "some additional knowledge" of the transaction. *Id.* He also recognized that IRS documents used to sustain the adjustment cited materials obtained from the summons. But he observed that "an economic substance adjustment would have been proposed without [Insinga's] submission," which did not "cause the Service to initiate the [V] audit, expand the scope of the audit, or continue to pursue an issue that it otherwise would not have pursued." *Id.* The Director again was not satisfied. This time, he asked for further clarification about whether the summonsed documents helped the V team develop its "economic substance" theory. *Id.* at 3817. In response, the manager expressed "doubt" that the documents "would have added to the teams [*sic*] knowledge" about that theory. *Id.*

In April 2013, the WBO issued a final decision denying Insinga an award. The decision stated that Insinga was not entitled to an award because his submission "did not result in the collection of any proceeds" from X or V. A.1760.

D

Insinga appealed the denial to the Tax Court, which may review "any [WBO] determination regarding an award." 26 U.S.C. § 7623(b)(4). The parties conducted discovery and then filed cross-motions for summary judgment. While the case was pending, the Tax Court clarified that its review in whistleblower cases is limited to the administrative record before the WBO. *Van Bemmelen v. CIR*, 155 T.C. 64, 72 (2020); *Kasper v. CIR*, 150 T.C. 8, 23 (2018). By regulation, that record includes all "information considered by the official making the award determination," as well as specific items such as the whistleblower's submission and all Forms 11369. 26 C.F.R. § 301.7623-3(e)(2). The IRS designated the

7

administrative record in accordance with this regulation, and the Tax Court rejected Insinga's motion to supplement the record with materials unearthed through discovery. A.92–93.

The Tax Court then affirmed on the merits. It found "nothing in the record" to support Insinga's contention that the WBO had erroneously applied the legal standard from the 2012 proposed regulation. A.94 n.9. According to the Tax Court, the WBO found that Insinga's information "did not substantially contribute to any IRS action," and the record "amply" supported that finding. *Id.* at 95.

## II

We review Tax Court summary judgments *de novo. Byers v. CIR*, 740 F.3d 668, 675 (D.C. Cir. 2014). In this case, that means we must apply the deferential standards of review set forth in the Administrative Procedure Act. *See, e.g., Villa-Arce v. CIR*, 68 F.4th 1328, 1331–32 (D.C. Cir. 2023); *Van Bemmelen*, 155 T.C. at 79. In particular, we must consider whether the WBO decision was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *Villa-Arce*, 68 F.4th at 1332. Under this standard, the WBO decision need only be reasonable and reasonably explained. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021). The decision need not be a model of clarity; we will uphold it so long as the WBO's "path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

## A

In my view, the WBO's decision easily survives this deferential review. The WBO correctly asked whether Insinga's report "substantially contributed to the collection of proceeds." A.3729. And after extensive investigation, it answered no. It found that the IRS had developed the winning

economic-substance theory months before receiving Insinga's submission. *See id.* at 3821. And despite acknowledging that the V team had obtained helpful documents from a summons issued as a result of Insinga's submission, it concluded that the IRS would have sustained the same adjustments even without Insinga's assistance. *Id.* at 3817, 3821. In making these findings, the WBO relied on representations made by the IRS audit teams permanently assigned to investigate X and V tax returns. *See id.* at 3736, 3485. And it verified these representations by considering additional materials including the March 2007 presentation, which concluded—several weeks before Insinga filed his submission—that "[t]he facts clearly support the position that the [X] transaction lacks economic substance." *Id.* at 1489. The WBO also considered memoranda from the Office of Appeals, which sustained the adjustments based on the economic-substance theory. *See id.* at 1454–97. In light of this record evidence, the WBO reasonably concluded that Insinga's contribution to the recovery of proceeds was insubstantial.

## B

My colleagues conclude that the WBO applied the wrong legal standard and should have considered more evidence. I would reject both contentions.

## 1

First, my colleagues conclude that the IRS improperly evaluated Insinga's claim under the proposed 2012 regulation. *Ante* at 13–20. That proposal would have limited awards to cases where the whistleblower caused the IRS to initiate a new action, expand the scope of an ongoing action, or pursue an ongoing action that it otherwise would have abandoned. 77 Fed. Reg. at 74800. My colleagues reason that the WBO must have applied the 2012 proposed regulation because a WBO

program manager, in recommending against an award, stated that Insinga's submission did not cause the V team "to initiate the audit, expand the scope of the audit, or continue to pursue an issue that it otherwise would not have pursued." A.3821.

This conclusion does not follow. Whether Insinga caused the V team to initiate, expand, or continue to pursue an issue is plainly relevant to the question whether he substantially contributed to the action against V, as the final regulation itself states expressly. *See* 26 C.F.R. § 301.7623-2(b)(1). But the WBO did not focus exclusively on those considerations. To the contrary, the WBO Director twice insisted on a much more nuanced assessment. In 2011, a program manager recommended denying an award because information developed from Insinga's submission was neither "of any significance" nor ultimately "utilized." A.3732. The Director objected that although the relevant issues had already been "identified" and were "being pursued," the V team nonetheless indicated that Insinga's information had been "helpful." *Id.* at 3729. The Director then instructed that the dispositive question was "whether that information substantially contributed to the collection of proceeds"—which was exactly right. *Id.* And he demanded that, in assessing that question, "'[h]elpful' needs to be quantified." *Id.*

A similar pattern played out in 2012. The program manager again recommended denial, this time on the ground that the economic substance adjustment "would have been proposed without the whistleblower submission," which "did not cause the Service to initiate the audit, expand the scope of the audit, or continue to pursue an issue that it otherwise would not have pursued." A.3821. On its face, that recommendation compelled denial of an award under the standard in the 2012 proposed regulation. But instead of uncritically accepting this recommendation, the Director once again demanded more.

Despite acknowledging that the appeals memoranda did not cite anything obtained from Insinga, the Director pressed the manager for more detail on how "relevant" the submission was to the IRS's winning "economic substance" theory. *Id.* at 3817. The manager responded that he "doubt[ed] that the documents summonsed" as a result of Insinga's submission "would have added to the teams [*sic*] knowledge of" that issue. *Id.* These deliberations show that the Director applied the correct legal standard in denying the award.

Timing considerations further undercut any inference that the WBO must have applied the proposed 2012 regulation. As explained above, the key deliberations occurred in 2011 and September 2012, yet the regulation was not even proposed until December 2012. To be sure, the WBO did not notify Insinga of its final decision until April 2013. But as explained above, the WBO's position had been settled by September 2012. And although more terse than the preceding deliberations, the April 2013 letter likewise applied a correct legal standard. It stated that Insinga's information "did not result in the collection of any proceeds," A.103, which fairly paraphrases the statutory standard of whether proceeds are "based on" information provided by a whistleblower, 26 U.S.C. § 7623(b)(1).

## 2

Second, my colleagues contend that the WBO negligently failed to consider additional evidence that it should have. *Ante* at 20–29. So, they conclude, the Tax Court abused its discretion in refusing to supplement the administrative record to include that evidence. *Id.* at 21.

This contention faces strong headwinds. For one thing, it is blackletter administrative law that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing

11

court." *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam). We have therefore stressed repeatedly that a reviewing court may supplement the administrative record only in "unusual circumstances justifying a departure from this general rule." *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991); *see City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (same); *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (same); *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (supplementation "at most … may be invoked to challenge gross procedural deficiencies"). And here, we do not decide the supplementation question *de novo*; instead, we consider whether the Tax Court abused its discretion in refusing to supplement. *See Am. Wildlands*, 530 F.3d at 1002.

In WBO proceedings, the administrative record must include "[a]ll … information considered by the official making the award determination." 26 C.F.R. § 301.7623-3(e)(2)(ix). This regulation reflects basic administrative-law principles. *See James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) ("The administrative record includes all materials compiled by the agency that were before the agency at the time the decision was made." (cleaned up)). We afford "a presumption of administrative regularity" to an agency's designation of the record. *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019) (cleaned up).

My colleagues highlight four items that the WBO excluded from the administrative record provided to the Tax Court: (1) the Chief Counsel's advice memorandum, (2) the NOPAs issued against X, (3) a revenue agent's report on V, and (4) internal IRS emails and audit plans. *Ante* at 22–24. My colleagues are correct that the WBO considered the advice memorandum, *id.* at 22, so the Tax Court abused its discretion in not supplementing the record to include it. But because the

WBO *did* consider the memorandum, its exclusion from the record cannot support the ultimate disposition here—a remand for the *WBO* to consider more evidence. *Id.* at 23. Relative to that disposition, the WBO's failure to include the advice memorandum in the record on review was obviously harmless.

My colleagues further conclude that the WBO negligently *failed* to consider the other three categories of documents, thus requiring both expansion of the administrative record and a remand to the agency. *Ante* at 22–24. They cite only one case expanding and remanding on that basis, *Kent County, Delaware Levy Court v. EPA*, 963 F.2d 391 (D.C. Cir. 1992). But *Kent County* confirmed that an agency need not locate and consider all internal documents bearing on the question at hand. *See id.* at 396. There, we supplemented the record only because the agency investigation had been obviously truncated, pulling a "single memorandum" supporting its position while ignoring other, readily available conflicting evidence. *Id.* And we remanded only because that degree of negligence or willfulness made the agency's decision "arbitrary and capricious." *Id.*

Here, in contrast, the WBO investigation was not arbitrary. As explained above, the WBO duly considered the Form 11369 submissions from the X and V teams, which had firsthand knowledge of the relative importance of Insinga's contribution to the IRS's legal theory. It corroborated these representations by reviewing the March 2007 presentation, which showed that the X and V teams substantially understood the relevant transactions before they received Insinga's submission. It further considered the appeals memoranda, which vindicated the economic-substance theory proposed by the X audit team in March 2007. And in internal deliberations, the WBO Director repeatedly prodded his staff to make sure that it had considered everything that could colorably support an award.

The WBO reasonably declined to track down internal emails and audit plans, the NOPAs for X, or the revenue agent's report for V—none of which would have added much beyond the items that it did consider. All but one of the internal emails and audit plans are dated January or October 2006. *See* A.1862, 1864–68. But October 2006 was when the IRS first designated the transactions at issue to be ones of top strategic importance. The agency made substantial headway in its investigation between then and April 2007, when Insinga filed his submission, as evidenced by the national presentation in March 2007. The final email reveals nothing beyond what was stated in the Form 11369 provided to the V team. *Compare id.* at 2074 *with id.* at 3485. And the NOPAs and the revenue agent's report contained information similar to what the WBO did consider, such as the advice and appeals memoranda. Moreover, these documents were not geared toward evaluating the substantiality of Insinga's contribution. For example, they said nothing about what the IRS knew before his submission, which was far more relevant to the question before the WBO. As to that question, these documents were cumulative and not especially important.

In sum, the WBO reasonably assembled the most important materials for determining whether Insinga was entitled to an award, and they strongly support the agency's conclusion that he was not. While these materials did cite some of Insinga's material, they did so mainly to support a fallback theory that the IRS appeals office ultimately abandoned and, as to the prevailing economic-substance theory, only to confirm points that the X and V teams had already developed before they received Insinga's submission.

For these reasons, the WBO did not act arbitrarily in failing to consider the disputed materials, and the Tax Court did not abuse its discretion in so holding.